**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| VIRTUAL PHYSICAL CENTER -, | : | |
| ROCKVILLE, LLC, *et al.* | : | |
| | : | |
| v. | : | |
| | : | Civil Action No. CCB-05-03252 |
| PHILLIPS MEDICAL SYSTEMS | : | |
| NORTH AMERICA, INC., *et al.* | : | |

...o0o...

**MEMORANDUM**

Plaintiffs Virtual Physical Center - Pikesville, LLC, Virtual Physical Center - Rockville, LLC, and Mid-Atlantic Radiology Specialists, LLC ( collectively "Virtual Physical") claim damages in an action arising out of the sale of medical equipment by defendant Phillips Medical Systems North America, Inc. ("Phillips").  Virtual Physical alleges that Phillips breached express and implied warranties in its sale of computed tomography (CT) scanning machines. Additionally, Virtual Physical alleges that Phillips committed fraud and negligent misrepresentation in its characterizations of the safety of the machines sold to Virtual Physical. Philips counterclaims that Virtual Physical refused to pay under a service agreement entered into by the parties thereby breaching that contract.  Now pending are Phillips's motion for summary judgment and Virtual Physical's motion for partial summary judgment.  For the reasons that follow, I will grant Phillips' motion for summary judgment, and deny Virtual Physical's motion for partial summary judgment.

**BACKGROUND**

Virtual Physical is a limited liability company which had locations in Rockville and

1

Pikesville, Maryland.  Its primary business is imaging of the human body to screen for

asymptomatic and potentially life-threatening diseases generally not detectable by physical exam

or standard screening tests.  In 2000, Virtual Physical contacted Phillips, a leading manufacturer

of CT equipment, to discuss Virtual Physical's desire to offer whole-body CT screens to the

general public.  The COO of Virtual Physical, David Klingler, had a long-standing friendship

with a Philips Regional Sales Manager, Stephen Meeder, and Klingler contacted Meeder about

purchasing Phillips' CT Secura, a full-body CT scanning product.

Under the FDA regulatory scheme, CT scanners require pre-market notification clearance

(510(k) clearance) from the FDA.  The CT Secura, a diagnostic X-ray system, received that

clearance.  Its 510(k) summary noted it was indicated for use to "produce cross-sectional images

of the body by computer reconstruction of x-ray transmission of data" and was intended for use

"by a physician in the diagnosis and planning phases of patient conditions and treatment."  (Pl.'s

Mem. at Ex. E, CT Secura MV 510(k) Summary, dated May 12, 2000.)  Despite the clearance of

some CT scanners, the FDA's website also noted that no data had been presented to the agency

indicating that tests performed for screening, i.e. testing individuals without symptoms, is safe.

(*See* Whole Body Scanning Using Computed Tomography, FDA Website,

http://www.fda.gov/cdrh/ct/regulatory.html (last updated April 17, 2002))  The FDA thus

concluded that individual physicians could decide whether asymptomatic patients could benefit

from these CT scans, but noted that statements indicating the FDA has approved CT screening

scans are incorrect.  (*Id.*)

Throughout 2000, Philips and Virtual Physical engaged in negotiations about purchasing

the CT Secura.  Virtual Physical alleges that, despite the FDA restrictions noted above, Phillips

understood that Virtual Physical intended to use Phillips' machines to conduct whole-body

screens on the general public.  In his deposition, Meeder admitted that Klingler told him that

Virtual Physical was planning to do screening services on patients without doctor referrals.

(Pl.'s Opp. Mem. at Ex. B, Meeder Dep. at 14-15.)  When asked whether anybody at Phillips

told him not to mention that screenings with the Secura were inappropriate, Meeder testified:

> Q: Did anyone from Phillips ever say to you that this equipment should not be used for
> screening purposes?
> A: Not at all.
> Q: Did anyone from Phillips ever tell you that the word screening is a bad word and it
> shouldn't ever be used in the sales process?
> A: Not at all.
> Q: Did anyone from Phillips ever tell you, either in training, or later as you worked with
> the company in sales, that the CT scanners should only be used with a physician referral?
> A: I don't even get into that.  I don't even listen to that, and I don't even know of
> anything like that.

(*Id.* at 15-16.)

Virtual Physical alleges that, in making the sales pitch, Phillips specifically told them that

the Secura was a safe product.  Jonathan Hazman, one of the owners of Virtual Physical, Inc.,

testified that Meeder told him the radiation emitted from the CT scanner was the equivalent of

four to six chest x-rays or "flying from the east coast to the west coast."  (Pl.'s Opp. Mem. at Ex.

A, Hazman Dep. at 19, 31.)  Meeder also told Virtual Physical that the CT Secura emitted the

lowest dose of radiation on the market, and Hazman testified that Virtual Physical planned its

marketing scheme around the fact that the CT Secura emitted the lowest dose of radiation on the

market.  (*Id.* at 56.)

In the negotiations with Phillips, Virtual Physical alleges that it told Philips it was

seeking a "partnership ... not a transactional sale,"  (Pl.'s Opp. Mem. at Ex. C, E-mail from

Joseph Marzullo to Stephen Meeder and Bruce Heinz, dated Jun. 22, 2006) and Meeder also

characterized the relationship as a partnership.  (*Id.* at Ex. B, Meeder Dep. at 26-27.)

Accordingly, Virtual Physical asked Philips to draft its marketing materials.  Virtual Physical

now argues that those marketing materials were deceptive and greatly understated the risks

associated with using the Secura.  The radio advertisements distributed by Phillips read:

> "Healthcare is changing.  In a way, it is getting - well - healthier ... Our new CT scanner
> from Philips takes pictures faster, so your doctor gets the results sooner - and so do you.
> And it uses less radiation, so it's safer for you and your whole family - especially kids.  It
> was easy for us to choose this new CT scanner."

(*Id.* at Ex. I, Radio Advertisements, at 1-2.)[1]

Virtual Physical and Philips entered into a contract on March 13, 2001, for the lease of a

Philips CT scanning machine.  In what appears to be the Contract's first page, the Contract

dictates the payment and delivery terms and the requested shipping date. (Pl.'s Opp. Mem. at Ex.

L.)  In addition, the first page also provides that the "Warranty Terms" are "12 months standard."

The conditions of sale listed in the back of the contract include a warranty section, which

provides:

> THE WARRANTIES REFERENCED IN THIS SECTION ARE THE ONLY ONES
> MADE BY PHILIPS AND ARE EXPRESSLY IN LIEU OF ANY OTHER
> WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION
> ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR
> PURPOSE AND IN LIEU OF ANY OTHER OBLIGATIONS OR LIABILITY ON THE
> PART OF PHILIPS.

---

[1] Phillips also produced several print advertisements that Virtual Physical alleges
depicted healthy families.  One, depicting a smiling mother and daughter stated:
> "She taught you right from wrong.  And now that she needs a CT exam, you can return
> the favor.  Tell her about our new CT system from Philips.  It uses the least amount of
> radiation to create images.  And it's so much faster, she'll be back to giving you advice in
> no time.  To learn more about our CT scanner, ask your doctor or give us a call."
(*Id.* at Ex. I.)

4

(*Id.*) (all caps in original)  In addition to the contract, the defendant attaches a warranty sheet with a section titled "One Year System Warranty," which provides: "Philips warrants to Customer that the CT System to be delivered and installed will be free from defects in material and manufacturing workmanship which appear within one (1) year after delivery at the Customer site."  (Def.'s Reply at Ex. K, One Year System Warranty at 1.)   Virtual Physical leased two CT Secura machines from Philips with these contract terms, with the latter delivered, according to the defendant, no later than November 30, 2001.  (Def.'s Reply, at 6.)

On June 5, 2001, the L.A. Times ran an article that discussed the risks associated with CT scanners.  (Marlene Cimons, FDA Raises Body Scan Safety Issue, LA Times, June 5, 2001, attached at Def.'s Mem. at Ex. F.)  That article noted that some Food and Drug Administration officials were worried that full-body CT screening scans "may be exposing thousands of Americans to unnecessary and potentially dangerous radiation," and that CT scans of the chest delivered 100 times the radiation of a conventional chest x-ray.  The article also stated that CT scanners can deliver between .2 to 2 rads of radiation during a single scan depending in part on a patient's body size.  A person identified as a Virtual Physical spokesman, responding to the FDA and doctor's concerns, was quoted in the article, stating that the company thought the products' benefits outweighed the risks.  The article further noted that a study was being conducted by the state of New York to investigate whether CT scanning was effective in detecting lung cancer in smokers.  No Philips machine was specifically mentioned in the article.

Virtual Physical claims that while it was being contacted for the LA Times piece, it was simultaneously contacted by a retired radiologist for a rebuttal article.  Published ten days after the LA Times piece, Doctors Glueck and Cihak directly addressed the LA Times article and

argued that full-body CT screening scans were safe.  (Michael Glueck and Robert Cihak, Letting

CT Scans out of the Bag, www.worldnetdaily.com,  June 15, 2001, attached at Pl.'s Opp. Mem. at

Ex. N.)  Citing to a Johns Hopkins study, the doctors argued that the benefits of such screenings

were significant, and that "the radiation dose from a whole-body CT scan is safe."  The doctors

also cited a New York Weill Cornell Center study that estimated that chest CT scans "could save

more than 100,000 lives annually in the United States by detecting lung cancer" at an early stage.

Virtual Physical states that this article confirmed Philips's representations that their products

emitted a safe level of radiation relative to the benefits received from the tests, though the article

did not directly rebut the claim in the LA Times article that a full-body CT scan emitted 100 times

the radiation of a chest X-ray.  Virtual Physical also notes that several articles published since the

LA Times article have argued whether such screenings are safe and effective with no consensus

appearing to have been definitively reached.  (*See* Pl.'s Opp. Mem. at 12-13.)

     While Virtual Physical's business was strong for the first part of 2001, leading it to open

another location in Rockville, Virtual Physical admits that business slowed around September 11,

2001.  Nevertheless, Virtual Physical leased another CT Scanner around November 30, 2001,

again claiming to rely on the representations of Philips that the device was safe.

     On December 18, 2003, Virtual Physical executed two Customer Care Service

Agreements ("Service Agreements") for the service and maintenance of the Philips's CT

Scanning machines for a period of three years.  (Compl. at Ex. C, D.)  These Service Agreements

state that "[t]he Agreement may be terminated by Customer upon replacement of the Equipment

or upon the termination of the underlying lease for the Equipment, upon 30 days prior written

notice."  Virtual Physical's business did not improve in 2003 and 2004, and the business went

through a strict foreclosure and transfer of assets to Mid-Atlantic.  On April 8, 2005, Mid-Atlantic

shut down the business.  On April 21, 2005, Virtual Physical informed Philips of its decision to

shut down its operations. (Am. Compl. at ¶ 35.)

Also in April 2005, Men's Health magazine published an article focusing on the side

effects associated with full-body CT scans.  In that article, Philips's senior director of marketing

for the CT business, Richard Nelson, was quoted as saying he did not agree that the radiation

exposure of the full-body CT Scans was equivalent to four chest x-rays.  (Tom McGrath, *An

Unhealthy Glow*, Men's Health, April 2005, attached at Pl.'s Opp. Mem. at Ex. U.)  The article

also stated Philips's position was that no one should get a full-body scan without a referral from a

doctor.  This was allegedly different from the position taken by Philips when it sold the CT

Secura machines to Virtual Physical.  That same article noted that Virtual Physical's website

claimed a patient would get the same amount of radiation exposure from a Virtual Physical scan

as they would by sitting in the sun for fifteen minutes.

In December 2005, Virtual Physical filed a complaint with this court, and filed an

amended complaint in January 2006.  The amended complaint alleged that Philips breached

express (Count One) and implied (Count Two) warranties to Virtual Physical affirming that the

CT Secura was safe and appropriate for whole-body CT scans.  Additionally, Virtual Physical

alleged that Philips committed fraud (Count Three) and negligent misrepresentation (Count Four)

by knowingly or negligently making false statements concerning the safety of the CT Secura.  In

March 2006, Philips answered the amended complaint and counterclaimed arguing that Virtual

Physical breached the two Service Agreements signed in December 2003.  In August 2006, after

discovery had taken place, Philips filed a motion for summary judgment arguing that the case

should be dismissed for Virtual Physical's alleged failure to comply with the statutes of

limitations applicable to warranty and fraud cases.  In September 2006, Virtual Physical filed a

partial motion for summary judgment arguing that any damages resulting from Philips's

counterclaim be limited to those incurred before Virtual Physical ended its operations.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The

court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all

reasonable inferences in her favor without weighing the evidence or assessing the witness'

credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002),

but the court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## I.      Fraud and Negligent Misrepresentation

Philips argues that the statute of limitations has run on Virtual Physical's fraud and

negligent misrepresentation claims.  Under Maryland law, a civil cause of action must be filed

within three years of the date the cause of action accrues.  Specifically, Md. Code Ann., Cts. &

Jud. Proc. § 5-101 (1998) provides: "A civil action at law shall be filed within three years from

the date it accrues unless another provision of the Code provides a different period of time within

which an action shall be commenced."  Maryland also recognizes the "discovery rule" in all civil

actions.  Under the discovery rule, "the cause of action accrues when the claimant in fact knew or

reasonably should have known of the wrong."  *Poffenberger v. Risser*, 290 Md. 631, 636, 431

A.2d 677 (Md. 1981).  The discovery rule requires that the plaintiff must have notice of a claim to

start the running of the statute of limitations.  The Maryland Court of Appeals has defined such

notice as "express cognition, or awareness implied from knowledge of circumstances which ought

to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of

all facts which such an investigation would in all probability have disclosed if it had been

properly pursued."  *Poffenberger*, 290 Md. at 637, 431 A.2d 677 (internal citations omitted).

The elements of a claim of negligent misrepresentation under Maryland law are well

settled:

> 1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
> 2) the defendant intends that his statement will be acted upon by the plaintiff;

> 3) the defendant has knowledge that the plaintiff will probably rely on the statement,
> which, if erroneous, will cause loss or injury;
> 4) the plaintiff, justifiably, takes action in reliance on the statement; and
> 5) the plaintiff suffered damage proximately caused by the defendant's negligence

*Shaw v. Brown and Williamson Tobacco Corp.*, 973 F. Supp. 539, 549 (D. Md. 1997).  The

elements of fraud are similarly well settled:

> 1) the defendant made a false representation;
> 2) the defendant knew the representation was false, or made it with reckless indifference
> to its truth or falsity;
> 3) the defendant made the representation with the intent to defraud the plaintiff;
> 4) the plaintiff justifiably relied on the statements; and
> 5) the plaintiff suffered damages as a result

*Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534, 537 (1982).  Philips argues that

Virtual Physical's allegations of fraud centered around the following misrepresentations: 1) the

radiation dose of a full-body CT scan is the equivalent of four chest x-rays[2], 2) the CT Secura was

appropriate for full-body CT scanning purposes, 3) the CT Secura machines were safer than other

scanning machines, and 4) the CT Secura emitted very low levels of radiation.  (Def.'s Mem. at

16.)    Philips claims that Virtual Physical was put on notice that the above statements might not

be true by three distinct pieces of information, each of which the plaintiff discovered by 2002.

First, Philips argues that prior to the sale of the CT Secura machines, Philips provided

Virtual Physical with the device's product literature information.  (Def.'s Reply at 11, n. 22.)  The

product specifications included the amount of radiation emitted from the CT Secura.  (Def.'s

Reply at Ex. N.)  Had Virtual Physical chosen to do so, it could have examined the amount of

radiation the CT Secura emitted and compared it to the amount of radiation emitted by a typical

---

[2] The Philips representatives denied making this statement.  (Pl.'s Opp. Mem. at Ex. H,
Heinz Dep. at 65.)

chest x-ray and by Philips's competitors products.  Doing so would have revealed that the CT

Secura emitted far more radiation than the "four chest x-rays" Philips allegedly represented[3], and

should have put Virtual Physical on notice that the CT Secura was not safe or appropriate for full-

body CT scanning purposes.

Second, the FDA had commented on CT Ssanners in general, and granted clearance to the

CT Secura in particular.  The FDA noted on its website that (1) no data had been presented that

tests performed by CT scanners on asymptomatic patients were safe and (2) the radiation

exposure of a CT exam can be several hundred times that of a chest x-ray.  (*See* Whole Body CT

Screening - Should I or Shouldn't I get one?, at http://www.fda.gov/cdrh/ct/screening. html) (last

updated 4/17/2002).  The 510(k) clearance for the CT Secura (dated in 2000) also specifically

stated that the device was intended for use "by a *physician* in the diagnosis and planning phases

of patient conditions and treatment." (Pl.'s Opp. Mem. at Ex. E, CT Secura MV 510(k)

Summary)(emphasis added).  Philips argues that if Virtual Physical had examined the FDA

documents, it would have been put on notice that Philips's alleged statements were false.

Lastly, Philips claims that the June 5, 2001 LA Times article put Virtual Physical on

inquiry notice that Philips may have committed fraud in making the misrepresentations listed

above.  The purpose of the article was to question the safety and efficacy of full body CT-scans;

indeed, the first line of the article stated: "Food and Drug Administration officials are worried

that the growing popularity of full-body scans for early health screening may be exposing

thousands of Americans to unnecessary and potentially dangerous radiation."  (Def.'s Mem. at

---

[3] It is apparently true, however, that Philips's machine emitted less radiation than its
competitors.  (*See* Pl.'s Opp. Mem. at Ex. A, Hazman Dep. at 53-56.)

Ex. F.)  Philips points to two other quotes in the LA Times article it believes gave Virtual

Physical notice to  inquire further about the validity of Philips's claims about the safety of the CT

Secura:

> "A CT scan of the chest delivers 100 times the radiation of a conventional chest x-ray.
>
> And 'you are doing more of the body at one time...'"; and
>
> "[M]any doctors believe the risks from the radiation more than offset the benefits from the
>
> unlikely detection of some types of early cancers or other diseases."

There is no question that Virtual Physical was aware of the LA Times article and the claims

contained therein.  A Virtual Physical spokesman was quoted in that article stating he believed

studies would eventually prove the company's product was safe.[4]  Because the article was printed

in June 2001, and Virtual Physical did not file its complaint until December 2005, the defendant

argues that the statute of limitations has run on Virtual Physical's fraud and negligent

misrepresentation claims.

Virtual Physical argues that at the time of the publication of the LA Times article, there

was an ongoing debate (which both parties concede continues to a certain extent today) as to the

safety and efficacy of CT scanners.  Virtual Physical specifically cites the article written by

Doctors Glueck and Cihak in June 2001 as evidence that the FDA officials and doctors quoted in

the LA Times article were wrong, and that CT scanners were safe.  To the extent there is an

ongoing and good-faith debate about the safety of CT screenings, however, it is not possible for

Philips's representations as to whether the CT Secura was appropriate for full-body CT scanning

---

[4] The Virtual Physical "spokesman" quoted in the LA Times article was Jon Hyman. (Def.'s Mem. at Ex. F.)  In any case, Virtual Physical does not deny that it was aware of the article.  (*See* Pl.'s Opp. Mem. at 21-22.)

purposes or whether the CT Secura emitted "very low levels of radiation" to be proved false.  The only purely factual statements - that the CT Secura emitted four times the level of radiation of a chest x-ray, and that the device emitted the lowest amount of radiation on the market - were not addressed in the Glueck and Cihak article.  In any case, the existence of other articles with a contrary view does not negate either the fact that the LA Times article specifically stated the level of radiation emitted from the device was 100 times greater than a chest x-ray or that the FDA publicly stated they believed that CT screenings were inappropriate for the general public without a prescription.  These statements alone put Virtual Physical on inquiry notice, and an examination of the product specifications together with the 510(k) would have shown Philips's alleged representations to be incorrect.

The case law that Virtual Physical cites is inapposite to the situation here.  Virtual Physical relies heavily on *In re Massachusetts Diet Drug Litigation*, 338 F. Supp. 2d 198 (D. Mass. 2004). In *Diet Drug*, the plaintiffs suffered from vascular heart disease, which they claimed was caused by a certain diet drug removed from the market amidst publicity in 1997.  *Id.* at 204. The plaintiffs, however, were asymptomatic until 2001 or 2002, and did not learn of their injuries until they underwent echocardiograms in those years.  *Id.* at 206.  The defendants argued that the publicity surrounding the diet drug in 1997 should have put the plaintiffs on notice that echocardiograms were necessary to diagnose possible injuries related to the diet drug.  The District Court of Massachusetts held that absent evidence of actual notice, the court, on the record before it, was not able to determine whether these particular plaintiffs were put on inquiry notice. *Id.* at 206-07 and n. 4.

*Diet Drug* is easily distinguished.  One of the crucial questions in *Diet Drug* was whether

the plaintiffs had actual notice of the possibility that asymptomatic plaintiffs could have their injuries revealed by echocardiograms.  The court stated "[t]hat determination will necessarily depend on the circumstances pertaining to each plaintiff, such as where he lived and what media coverage there was in that location. ... It may be that individuals in some locations were put on notice of the need for an echocardiogram while others, in different locations, were not." (*Id.* at 207.)  Unlike the plaintiffs in *Diet Drug*, there is no question that Virtual Physical had actual notice of the information in the June 5, 2001 LA Times article.  In that article, a Virtual Physical spokesman was quoted responding to the claims that CT screenings were unsafe and inappropriate for the general public.  Virtual Physical had further notice of the radiation levels when it was given the CT Secura product specification sheet and had access to the CT Secura's FDA 510(k) summary sheet.

Given that Virtual Physical was using the CT Secura as the centerpiece of its business model, it had a reason to investigate the safety and efficacy of the device after being presented with evidence that it might not be safe and that it might emit more radiation than previously thought.  While not condoning Philips's alleged misrepresentations or its apparently undisputed involvement in a questionable advertising campaign, I find it hard to comprehend that Virtual Physical would not have undertaken the minimal investigation necessary to verify the amount of radiation emitted by the Philips machine before encouraging the public to undergo full-body exposure without a doctor's referral.  In any case, I find that Virtual Physical was put on inquiry notice by June 5, 2001, the publication date of the LA Times article, and certainly before December 2002.  Virtual Physical had three years to file its complaint against Philips for the fraud and negligent misrepresentation claims and failed to do so.  Accordingly, Virtual Physical's

claims are time-barred.

## II.    Breach of Warranty

Philips argues that Virtual Physical's breach of express and implied warranty claims are barred by the applicable four-year statute of limitations.  CT scanners are "goods" under the Maryland Commercial Law Article, and Section 2-725 dictates that an action for breach of warranty be commenced within four years of the accrual of the cause of action.  Md. Code Ann. Comm. Law §2-725(1) (2002).  A cause of action accrues for purposes of § 2-725 "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered." §2-725(2).  Here, Philips argues that the second CT scanning machine was delivered on November 30, 2001 and the complaint was filed in December 2005, days after the statute of limitations had run.  Philips further argues that the narrow exception to § 2-725 does not apply, because the warranties did not "explicitly extend to future performance."

Philips is correct that an alleged breach of implied warranty cannot explicitly extend to future performance.  The Maryland Court of Appeals has held that "an implied warranty is not explicit" for purposes of § 2-725 and, thus, "the statute of limitations will always start to run against claims based on implied warranty from the time when delivery of the goods is tendered." *Washington Freightliner, Inc. v. Shantytown Pier, Inc.*, 351 Md. 616, 624, 719 A.2d 541 (1998) (internal citations and emphasis omitted); *In re Lone Star Indus. Inc.*, 776 F.Supp. 206, 220 (D. Md. 1991).  Because Virtual Physical agrees that the machines were delivered no later than

November 30, 2001, plaintiff's implied warranty claims, filed December 5, 2005, are time-barred.

Virtual Physical's express warranty claims are also time-barred.  The CT Secura contracts included a "One Year System Warranty" which provided: "Philips warrants to Customer that the CT System to be delivered and installed will be free from defects in material and manufacturing workmanship which appear within one (1) year after delivery at the Customer site."[5]  (Def.'s Reply, at Ex. K, One Year System Warranty at 1.)  Virtual Physical contends that this warranty was a warranty for future performance, thus extending its time for filing its claim to four years from the end of the warranty period, or November 30, 2006.

The One Year System Warranty guarantees that the product "will be free from defects in material and manufacturing workmanship."  (Def.'s Reply, at Ex. K, One Year System Warranty at 1.)  Thus, if Virtual Physical's express warranty claims arise out of a defect in material and manufacturing workmanship its warranty claims extend to future performance and its claims may not be time-barred.

The terms of a contract "are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words."  *Turner v. Turner*, 147 Md. App. 350, 809 A.2d 18, 49 (2002).  Under Maryland law, "a contract is not

---

[5] The One Year System Warranty contained a Limitations of Liability and Disclaimers section, which stated:
    THE FOREGOING WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OF ANY KIND.  CUSTOMER'S SOLE REMEDIES FOR BREACH OF ANY AND ALL WARRANTIES RELATING TO THE SYSTEM ARE SET FORTH IN THIS WARRANTY, NO IMPLIED WARRANTY OF MERCHANTIBILITY OR FITNESS FOR USE SHALL APPLY.  PHILIPS NEITHER ASSUMES (NOR HAS AUTHORIZED ANY PERSON TO ASSUME FOR IT) ANY OTHER WARRANTY OR LIABILITY IN CONNECTION WITH THE SYSTEM. (all caps in original).
Def.'s Reply, at Ex. K, One Year System Warranty at 3.

ambiguous merely because the parties disagree as to its interpretation." *Lerner Corp. v. Three Winthrop Properties, Inc.*, 124 Md.App. 679, 723 A.2d 560, 563 (1999).  Instead, under Maryland law, a contract is ambiguous only if it is subject to more than one interpretation when read by a reasonably prudent person. *See Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 829 A.2d 540, 547 (2003).

The question before the court is whether the CT Secura suffered a defect covered by the warranty guaranteeing that the product "will be free from defects in material and manufacturing workmanship."  The plain language of the contract suggests that Virtual Physical's express warranty claims are not covered by the guarantee.  In its complaint, Virtual Physical claims that Philips made affirmations of fact that its scanning machines were safe and appropriate for whole-body CT scans and emitted low levels of radiation.  (Am. Compl. at ¶ 48.)   To the extent that Philips's products were unsafe, inappropriate for whole-body CT scans, and emitted high levels of radiation, those defects would constitute defects in design and not of material or manufacturing.  *See, e.g., Stanley Martin Companies, Inc. v. Universal Forest Products Shoffner LLC*, 396 F. Supp. 2d 606, 622 (D. Md. 2005) (manufacturing defect occurs when "the product at issue either was not manufactured in accordance with the product's design specifications or that during manufacturing process the [product] was assembled improperly or that some other error occurred"; *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 560 (S.D.N.Y. 2005) ("A manufacturing defect is a flaw that results from the manufacturer's plans not being carried out correctly, usually caused by an error during the product's manufacture or assembly").  The One Year System Warranty guaranteed only that the machines would be free from defects in material and manufacturing workmanship, not design defects.  In fact, the One Year System Warranty

explicitly disavowed any warranties relating to "Fitness for Use."  (Def.'s Reply, at Ex. K, One Year System Warranty at 3.)

There is no suggestion in the record that the machines were assembled improperly, were not manufactured in accordance with the product's design specifications, or malfunctioned; instead, the machines appear to have emitted as much radiation as they were designed to emit. Virtual Physical has provided no evidence to suggest that a material or manufacturing defect affected the particular machines that it received from Philips. Accordingly, the devices are not covered by the plain language of the future warranty.  As the defendants did not breach the warranty that extends to future performance, Virtual Physical was required to file its breach of warranty claims within four years of tender of the goods.  Because Virtual Physical filed its warranty claims outside the statute of limitations period, its warranty claims, like its fraud and negligent misrepresentation claims, are time-barred.

### III.    Breach of Contract

Virtual Physical argues that Philips's counterclaim for breach of contract arising from Virtual Physical's alleged failure to make payments under the Customer Care Service Agreements, signed December 18, 2003, should be limited to damages incurred prior to May 25, 2006.  The Terms and Conditions of those Service Agreements state that: "[t]he Agreement may be terminated by Customer upon replacement of the Equipment or upon termination of the underlying lease for the Equipment, upon 30 days prior written notice."  The underlying lease for the Equipment was provided by Citicorp, and the terms and conditions of that Master Lease Agreement state that the Master Lease can only be terminated if Virtual Physical is in default and Citicorp elects to terminate the lease.  In its motion for partial summary judgment, Virtual

18

Physical argued that it exercised its right to terminate the Service Agreement when it informed

Philips on April 25, 2005, that it had ceased operations.  Virtual Physical claims that this letter

provided notice to Philips that the underlying leases were terminated.   In its opposition, however,

Philips argues that the record is devoid of any evidence showing that the underlying leases were

terminated.

In its reply, Virtual Physical argues that Citicorp instituted a lawsuit against Virtual

Physical arising out of Virtual Physical's failure to make payments to Citicorp under the Master

Lease Agreement.  (Pl.'s Reply, at Ex. A, Citicorp Complaint.)  Virtual Physical contends that

commencement of the lawsuit amounted to notice to Virtual Physical of the termination of its

underlying leases of the equipment.  While Citicorp did not specifically state that the lease was

terminated, Virtual Physical argues that Citicorp's actions indicated the lease was, in fact,

terminated, especially given that Citicorp pursued payments due under the balance of the Leases.

(Pl.'s Reply, at 3.)

While it appears that Virtual Physical would prevail on the issue, without an affidavit

from a Citicorp employee or evidence of the understanding between Citicorp and Virtual Physical

regarding the underlying lease, I am unable to find, as a matter of law, when the underlying lease

was terminated.   Accordingly, the plaintiff's motion for partial summary judgment will be

denied, in the expectation that the parties can come to some agreement on this issue with, if

necessary, minimal additional discovery.

A separate order follows.


___March 16, 2007_____                    _____/s/_____
Date                                            Catherine C. Blake
                                                United States District Judge